Good morning, Your Honors. May it please the Court, my name is Jim Robesons. At counsel table with me is my co-counsel, David Gerrard. We represent student Doe. I would like to reserve six minutes. Are you going to be using all the time yourself or are you sharing it with co-counsel? I will be using it all. Okay. Your Honors, this is a case about a fight in the family home between brother and sisters during a school vacation. A case where there was absolutely no reason to believe that that student was in any danger to anyone at the school when he returned to school a week later. It's a case where they have a policy at the school that if a student engages in any act of violence, any act of violence, anywhere, anytime, there must be an emergency expulsion and there can be readmission to school only if the parents obtain a risk assessment that says he's safe to be admitted to school. And this is a case where the school district, after he gave, after his parents gave them that assessment, they did readmit him to school. Now does the policy, you said there must be an emergency expulsion, does it, am I incorrect that they must, if they contact them, they can do an emergency expulsion, but they have a little hearing before they decide whether, or are you saying it's a foregone conclusion that there must be? No, there is, there's no discretion and the testimony that we put in the record is clear on that. The principle in this case testified, once there is an act of violence, there must be an expulsion. The only thing that happens is that they have a meeting at which they inform the parents there has been an expulsion and here's why or what you need to do if your child gets back in. It's an indefinite length expulsion until you bring us proof that he's safe to be admitted back into the school. And there never was any discussion of ever holding any hearing about whether or not the expulsion was fair or just. Well, I thought the record though said that the person that was holding the hearing didn't make the decision to expel until after, you know, partway through the hearing. You're correct, Your Honor. The record contains, I don't consider this conflicting evidence, but you might, the record contains the principal's testimony that we decided on the morning of February 28th to expel him. We decided that the policy requires that we expel him. We decided that I would take the responsibility of calling the parents to tell them he was expelled and to get them to an evening meeting where the principal would explain what he had to do to get back and that principal testified, and I've quoted in the brief, that the decision, final decision to expel was made that morning before they ever saw the child or either parent. Now there's also testimony in the record that the superintendent said at one point, I did not make up my mind, I did not make a final decision in my mind to expel him until then. You know, what difference does it make when the only power to expel was rested in the superintendent? So what if the principal may have thought that, or so what if the evidence says that? Doesn't that mean that the only authority to expel the student under the statute is the superintendent? Am I misreading the statute? I don't know that any statute specifies which person can expel. Well, what's the policy say then? We're not dealing with a statute. In other words, what authority do you say that they relied upon to expel the student? Well, according to Ms. Gillespie, the principal, the associate principal, the principal and the superintendent met and all three agreed and made a final decision to expel. My question is, if there's no authority, then you can't expel at all. But is there any authority that allows them to expel? Yes, there are WACs which say there are rules, and if you violate these rules, the student can be expelled. I don't believe that those WACs specify. I don't believe that those WACs say these are the people authorized to expel. Okay, then I'm going to have to go back and re-read the record, because it was my understanding, I think, that the superintendent was the only person that had the authority to do the emergency expulsion. But I may be wrong. I may be wrong, too, Your Honor. But, counsel, if I could interrupt for just a second. Let me make sure I have the facts straight. As I recall, this young man's father was a psychiatrist and his two sisters, and threw a pair of scissors at one of the sisters and actually struck her in the leg, as I recall, right? And the father, a psychiatrist, a trained mental health worker, felt the situation to be grave enough to contact the authorities, correct? I would say all of that is correct, except possibly, I think, sort of the inferences you're drawing from the second part. Okay. Because I think the facts are that the father wasn't home, the mother wasn't home. They were tired of misbehavior on the part of this... Well, he was already in counseling. And the girls locked themselves in the room. No, that is not correct. The district court judge said that, but that is not correct. And there's no evidence of that. And it's specifically denied by the girls. And they called their father. Their father called 911. Yes, that's correct. And the answer is... And there was a bunny or rabbit or something. That's what... The knife was something to the effect of, you know, you have a rabbit. Your rabbit could get in trouble. The father did call the police. And I think to fairly characterize the record, it's he's tired of misbehavior from his son. And there are going to be consequences. And so the police are going to be called. But to say that the father thought that the daughters were in danger, I think, is not a fair characterization of the record. Does that... The record does not contain a statement that the father told the police that his son was out of control? Yes, it does contain that, out of control. Well, what does out of control mean? Well... I mean, is that enough? I mean, I suppose if you told the police my son is acting up, they might not respond. Is that right? I suppose. Yeah. The question in this case, or one of the questions, the first procedural due process question has to do with whether or not the timing... I suppose there never was a hearing. But even if you called what happened on the evening of February 28th a hearing, it came after the expulsion. And the normal constitutional rule of Goss is hearings first, expulsions or exclusions later. Well, I think Goss also recognizes that under certain circumstances, you can have a temporary removal from the school in order to protect the safety of the school or the child. Exactly. And I think all he said was... Get me... I want to make sure I get the record right, because I want to understand your argument. It seems to me when the mother came to school that morning with the child, they said, you're going to... He can't come to school. Yes. And the reason is because of this incident, and you're going to have to... And the mother said she has counsel by this time. She doesn't want to respond. And so then the meeting was set for that evening. Is that the sequence of events? Except for it wasn't in the morning that she said anything. Oh, whatever. About the counsel. The first meeting. Yes. Because she did not respond to the charge. She was told about what Officer Munoz had told them and about what the son supposedly did. And the mother would not respond as I principle. Well, she did not respond. She wasn't asked for a response. She was told, this incident happened, your son is being excluded, we have a policy, he must be excluded, you come back tonight and the superintendent will explain it to you. Did she ever say at some point, I can't say, I've been advised by counsel not to say anything? My understanding was she said that, but then also the minor then basically after listening to the school's statement of the offense, admitted that that had occurred. In the evening meeting, that's correct. And by the way, on the exclusion issue, because I want to clear up the point we were ready for, WAC 180-40-295 indicates that the school superintendent or a designee is the one that can issue the emergency expulsion. Now, I don't know that the record ever says whether there was a designee. And I don't know whether, and so I take it from the record and its provision that it was going to have to go to the superintendent that evening so that they would discuss the emergency expulsion. Well, don't we factually have the issue of the principal's not there at first? No. The principal is there. The superintendent is not there at first. In the morning. In the morning. In the morning. So it's the superintendent that wasn't there. But at the very, very, very least, you would have to say there's an issue of fact, because the principal testified a final decision was made in the morning. It was a done deal. But you were... But there's nothing in the record that says under the statute. They could have done almost anything, but it couldn't have been an emergency expulsion. Now, I don't know where your argument goes then, because there's only authority for the expulsion. So you're saying then it was an unauthorized expulsion entirely. I'm not saying that the person, the persons who decided, whoever it was, I'm not saying they didn't have authority. But I am saying that the timing of it violated the rule of Goss, which has an exception, which I believe Your Honor pointed out, a narrow exception, which Your Honor pointed out, which is that when there is good reason to believe that the child is an immediate and continuing danger to the safety of the people in the school, they can exclude first and have the hearing later. Well, counsel, if you... Let me interrupt you, because that's what I was trying to get at. You don't think that that exception applies in this case? Absolutely not. So you have a child who waves a knife, threatens two sisters, throws a pair of scissors at one of his sisters. You don't think that exception applies? Not when it was seven days ago. Not when the juvenile court said in releasing him, and go back to school. Not when he's been in the home living with those sisters problem-free for five days. And not when he's been to the school for a day with no problems. And not when the school liaison officer, who is the police officer who interviewed him in juvenile detention, has said that he didn't think the kid meant any harm and that he was sincerely sorry and that he believed him when he didn't intend to harm his sisters, who do not go to that school. No. I don't think under any stretch of the imagination this court could conclude that. Well, but think about... Think about... There have been situations of school violence where there was no warning whatsoever. What if, hypothetically, just assume that he did go to school and he hurt someone, and the school had knowledge of this particular incident, and you were representing the people that got hurt. Wouldn't you claim that the school had knowledge and didn't do anything? I mean, I'm sort of seeing, you know, it's like, okay, what's the old darned if you do and darned if you don't, or that's not the exact same. But it's, you know, I mean, the language in the cases talks about how the school is essentially in loco parentis, and parents don't have the ability to protect their children when they're there, and when the school becomes aware of dangers in the school, they have to be responsible about it in light of the other students, and also procedurally balance the rights of the student that is perhaps accused of something. I would not make that argument. I wouldn't think that an attorney for such a family could make that argument, not on the facts of this case. I think the presumption, and that's what this policy contains, is basically an irrebuttable presumption at the time of the exclusion, is that any child who has a fight with any sibling in his home under any circumstances is always to be ---- Let me interrupt you just a second. This wasn't just any fight. This was somebody throwing a pair of scissors at someone. That's not any fight, is it? I mean, is it? I think that from what I understand, what's more physically violent was the punch. He threw scissors. They didn't hit the sister. He picked up a knife, and he said something about your rabbit. Would make a nice hat. That's it. That's it. If I counted up the number of fights that my brothers and I had, I mean, they were physically violent fights. People have children who have physically violent fights all the time. But the police didn't get called. That's another factor. If the school didn't know about it, and that would be a whole different thing. If the school didn't know about it, but once you know about something, then you've got to be responsible. I have a couple areas I want, you know, we're sort of, one of the things that you talk about is expungement, and I want to, the school, my understanding of what they have said is no, they're not going to expunge it. They need it at the point that the minor graduates, then they'll be shredded. Now, have you actually seen what's in the file? I haven't. I think Mr. Gerard has. Okay. My question is, and I'm going to question Appelli about this. I mean, Levine apparently went to that there were things additionally that were in the file, and there were things that were inaccurate. What, you know, what are your concerns about this file? What are your, you know, what, are you concerned they're not going to shred it? Are you concerned that he's going to have to answer on applications? What are you concerned about? If it's not expunged, then it does still exist. I am most concerned that he's going to have to answer questions about it. What did the school tell you about that? I don't know that the school told us anything about whether or not colleges would ask him questions about that, but I want to point out that in Goss, the U.S. Supreme Court took note at that time, which is early 1970s or mid-1970s. They said that if these charges are recorded, sustained and recorded, they could seriously interfere with later opportunities for higher education and employment. And in a footnote, they said that the Appellees asserted that Ohio colleges, some of them, specifically inquire of the high school of every applicant for admission whether he's ever been suspended. We have cited the same thing essentially to you, not about Ohio colleges, but the Common of all colleges in the United States asks, and it does a good job of asking, have you ever been suspended, expelled, disciplined, excluded from school? He's going to have to answer the question truthfully, yes, and that's going to impact seriously his abilities to get into the college he wants to get into. And Goss specifically recognized that there were two constitutionally protected interests, not only the property interest in education, but the liberty interest in reputation is also implicated, they said. And they stressed the honor, integrity and reputation of the student. And that's one of the reasons they said that procedural due process kicked in was this liberty interest. Now, in Levine, they actually took their first record of what they had done to Levine and the student and took out all the sort of factual details and just sort of left he was emergency expelled. And the district court still said that's inadequate, that's not sufficient to protect him because you subsequently discovered that he was not a danger to the school, you readmitted him to the school, and long past the time of the emergency, you still want to keep this record. But the school's argument, obviously, is while he's at the school, all right, the minor has admitted all of these things. It's not a situation where it's been determined that there's factual innocence or anything along those lines. The minor admitted to the police officers, admitted to the school, all of that. And he's going to be at the school for a while. What if another incident happens? So then that should be evaluated in isolation as opposed to it's the second incident? Wouldn't that, doesn't that inform the dangerousness of someone if you have a second incident? Are they going to forget it? I mean, it's totally implausible to think they're going to forget it, Your Honor. And they say we'll shred the physical record when he graduates, which will be after he's done all this applying to colleges and it's determined what college he gets into. Wait a minute, this is middle school. Yes, and they say they're going to keep it until he graduates from high school. That's what they say. From high school? That's what they say. And I'm not sure that he's still in middle school. He's in high school now. And they're going to keep, he's 15 now, I believe, and they're going to keep it for three more years. And while he's applying to colleges in the 12th grade, he's going to get asked. Well, what concerns me, what are you going to do with the arrest record and the juvenile record? Well, if he gets asked that question, I guess he has to answer that also truthfully. He can say yes. And he can also say the charges were diverted. I was never convicted of anything. And he can tell them it happened at home. But it doesn't have this extra stigma of you're too unsafe to be allowed to come to school, which is something which they determined was untrue. He's not too unsafe to go to school. And they put the burden of proof on him to prove that he was safe rather than assume the burden of proving that he was unsafe, which also violates COPS. We haven't made a decision, but let's assume we find that the emergency expulsion was okay. Do you still shred the records? What I am seeking is not just a shredding of them. No, excuse me. Well, do you still ask for the records to be totally expunged? In other words, let's assume that we find, for whatever reason, that the emergency expulsion was okay. Now, do the records now, do you want the further relief of injunctive relief to get rid of the records? That's right. And I think Levine practically... One on one. And it would do all Levine. Well, Levine practically compels that, doesn't it? I mean, look at that language. It says it was beyond the legitimate documentation needs of the school district because it was over and it was determined that he was safe to be in school. And they let him back. And look at what Levine did. He wrote a poem saying he was about a student gunning down students in a classroom. And there was infinitely more reason to think that he was a danger. And they said it was a close case. Well, it's a First Amendment case as opposed to a conduct case. True. There is difference there. True. I've used up all but ten seconds of my time. I know. Well, it's really our time to ask you questions. So if we have any additional questions after we hear, I'll give you a little bit of extra time on rebuttal. All right? I won't argue it. I just want to say I'm also pressing the point that constitutionally there has to be a nexus between the school and the conduct. Otherwise, I believe it's a substantive process violation. Yes. I think you made those arguments. Thank you. Good morning. Good morning. Michael Tierney representing the Mercer Island School District. My attention is drawn to a number of facts that I believe will be important for this Court's consideration and which have either been not given much attention or misstated. I think one very, very significant point to make is that this incident where the student was arrested was the second incident with police, not the first. Now, that brings a question because it was festering in my mind when counsel was arguing. What did the associate principal on the first contact with the mother know about the history of this child and this incident? Now, we know that he was arrested, that Officer Munoz contacted the school district, and that's how they found out about it. But what did they know? Did they know about the prior incident where he was not arrested and about the fact that he was in counseling before this incident? I am not positive from the deposition of the associate principal whether those questions were even asked. No, I'm not saying that. I'm not saying that because when the associate principal is talking to the mother, what history does he have other than the fact that Munoz said he was arrested? That's what I'm saying. I don't believe the record is clear on exactly what was told to the associate principal. What we do have is a record of what the superintendent was told, and her testimony is that Officer Munoz told her about the previous incident and that Officer Munoz brought this to her attention. So at the superintendent's level, at least all those background facts were before the superintendent? That is what her deposition testifies. And do you agree under the WAC that the superintendent is the one that can impose the emergency detention or expulsion? I believe so. I think there's a little bit of gray area where it talks about somebody being removed from school, but when it talks about emergency expelled, and honestly, I'm not sure how the two look differently, but I can imagine the situation where if students are fighting in a classroom, somebody removes the student from the school and sends him home. You don't call the superintendent to get him out of the building. That's not the situation we have here, though. We have different facts than that. But factually here, there is, I guess, a delay before the hearing in the sense that people aren't readily available. So when the minor presents at school before a hearing, the minor is told to go home, right? Well, yes, but there are a couple of other things that happened in there. Before the minor even came to school, the principal called his father and told the father that there was a problem, that the child would not be allowed into the school. That is in the record at ER 23 and 46, the testimony of both the father and the mother. The father told the principal that he was busy at work, please call the mother. So the principal then called the mother and told her we have to talk about this. So there are at least two instances of notice to the parents before anything has happened that the child is going to be removed from school. So then there is a meeting. Excuse me, you can't talk from the audience, all right? So you have lawyers sitting at the table and I have a lawyer at the podium, so I'm going to have to ask that people in the audience don't make comments. And again, this is in the record in their testimony. And I believe the father's testimony is also that he called the mother and told her to expect a call from the school. Then the mother and the student are at the school, and it isn't just go home. There's a discussion that takes place. The mother is handed copies of the at-risk of violence policy and the list of approved evaluators. As the record shows, it seems to be in the briefs the discussion of the fact that that is disputed or whether those documents were furnished to the mother. Well, I think in her declaration, which I don't know if it begins on ER 23, but it's somewhere in that declaration that covers ER 23, where she describes being handed those, I think the dispute is whether there was additional materials handed to her in the form of the regulations regarding appeals and the WACs. But there is no dispute that she was handed the student's at-risk of violence policy and the list of approved evaluators. And so... At what point did the school district make the official determination to emergency expel Doe? Well, the testimony of the superintendent is she made it at the meeting with the parents in the evening. And she describes that at length. And this is one of the other facts that I wanted to point out. This was not a quick meeting. All right. But then we also have the principal. Gillespie seems to indicate in her deposition that the associate principal, Budzius, Superintendent Sims, and she met in the morning of Tuesday, February 28, 2006, to discuss Doe's assault and that they determined that this was an at-risk of violence event and that the SAV policy required expulsion. I believe so. That is her testimony. However, later in her deposition, Principal Gillespie indicated that Doe could only be suspended by Superintendent Sims during a meeting with Doe and his parents. So I guess my question is, with all of that, was the decision to expel Doe made prior to or during Superintendent Sims' meeting with Doe and his parents? The testimony of the superintendent is that it was made at the meeting with the parents. I think the overarching issue in all of this is, does the superintendent have any discretion here? Does anybody at the school have any discretion? And I think the answer is obviously yes, of course they do. This is not some straitjacket. This was written by the superintendent in a group effort with the police, with a number of other folks. Well, if you determine, for example, that the incident did not occur, say, for example, if the person denied it and there was other evidence, which was not in this case the minor admitted it, but if the minor had denied it and there was other evidence indicating it may not have occurred as indicated, would the superintendent have discretion not to emergency expel? I think certainly, and I think that's what she describes in her deposition, and if I could have a minute I would find it, where she, I believe it's in the supplemental excerpts of record at page 93. There are several pages of her deposition there, but somewhere in there she describes what this meeting is, and she says, I listened to the parents, I listened to the student, and at the end of that time I decide. Can we stop there just for a second, because I've had a little bit of confusion trying to sort this out. My understanding is that the child, though, admitted to Munoz of the assault, and he also did it at the meeting with the superintendent. Is that correct? I believe, I think that's correct. I can't tell you exactly where that is in the record, though. I believe that is correct. My problem is I don't know what he admitted, because it seems to me I remember thinking that he admitted to Munoz what he was charged with. In other words, and I've never figured out specifically anybody saying he admitted blank, blank, blank, blank, blank. Then there's the other side of it. At the Juvie hearing, the sisters recounted a little different story about what was happening. So I have a confusion about what the admission of Doe was in those two occasions versus what happened at the Juvie hearing when there was a little bit different story. I'm sorry that I can't precisely indicate the difference in those, but I'm sorry. Well, it's important, because there's an allegation here, or there's an assertion here, that this really wasn't a serious deal, that it wasn't a danger. It seems to me it all occurs because, as the case law goes, we're all going back to what Doe admitted, not somebody coming in and testifying. It all turns on what he admitted. Am I wrong on that? Yeah, I think you are. So now where do we find out what was actually admitted? Well, I don't think that, to the extent there was any variation in exactly what was admitted, it was substantial or it was something that would affect the decision that was to be made. Well, counsel sort of gives us a little different story about the incident. First of all, it starts because the children are at home, and incidents happen between Doe and the two sisters. And now there seems to be a little blurring about what that was all about. There's a 10-inch knife involved, apparently. There were scissors involved, and maybe a punch. But how that all occurred seems to be a little bit blurred. So I'm wondering, what did Doe admit? Well, my understanding is that Doe admitted, yes, I punched her, yes, I threw the scissors at her, yes, I waved a knife at her. Where does your understanding come from? I wish I could show you exactly in the record, but I believe all of those things are discussed in Officer Munoz's deposition. I think they're also discussed in Cindy Simms' deposition. That's coming to about where I was. It seems as though it's what Officer Munoz says that Doe admitted. Well, there's also his admission in the juvenile court. Now, that had already happened. I don't think he's busy denying anything seven days later. But I think in juvenile court, if we're going to go back there, I think that the daughters testified a little bit different about the nature or the character of the incident. Well, I think they said they thought their brother loved them and that they were willing to have him back in the home. And he wasn't trying to hurt them, when, in fact, the other side of it is that the call is made to the father, and the father is told by the daughters in such dire straits that he calls the police. Now, that's two different stories to me and two different applications. And yet, I again go back, where are Doe's words? I don't know that Doe's words are recorded anywhere. Well, the words, Doe was out of control, and the girls were, quote, locked in their room, close quote, are found in the supplemental excerpt of record. And what's the source of that? That's the police report that Officer Munoz read. So, again, we're back to Munoz a little more. Well, no, this isn't writing. I know, but the source is Munoz. No, I think the source is the police report, and Munoz. Which is developed. It doesn't come out of midair. Munoz said something, and it gets in the police report. No, no, Munoz did not write the police report. Okay. Munoz did not go to the house. You're right on that. So it would have been the police officers. Munoz takes a police report and then reports it back. The portion of the report I'm speaking of looks as though, and I can't go back to all that in my memory banks right now, as though that is the part created by the call center. Exactly. On what the call is that came in. Because that seems to be the central piece of how we get to an emergency expulsion. Well, we wouldn't get there unless we had those facts. I think the fact that the student, that the situation at the home, was serious enough for the parents to twice call police and to once allow the son to be taken and spend the night in jail, regardless of the specific details of exactly what happened, that is enough to trigger the school's duty. I'm not saying option, but duty to act to protect other students. I don't think the details of whether he waved the knife or just held it in his hand are going to be that significant to the superintendent when she is looking at the question of whether there's a threat to other students. Well, if he was waving a wet noodle, we wouldn't be here. An inch knife and the scissors are meaningful. But I think the questions at the juvenile court were, well, he was holding the knife, but was he really waving it? I don't think that difference makes any difference in the determination to expel him, and that doesn't make any difference in the school district's duty to apprise a risk that may exist to other students. That is what triggers the emergency expulsion, because the key difference here is the school district out to punish a particular type of behavior. Is this a disciplinary action to punish somebody, or is this an action to protect students because of a perceived risk, until we at least find out whether that risk actually is as serious as it may appear on the surface. Well, counsel, I would like to talk to you about what's in his file, what representations have been made about that, you know. Now, the school district said it will shred his record upon graduation. Is that graduation from middle school or graduation from high school? Graduation from high school. All right. And what exactly is in the file? Again, we've given it a little time. Somewhere in Cindy Simms' deposition she says the file contains the two letters that she wrote, the first one that describes her decision and the second one that describes his reinstatement, and that that's what she said is in the file. And she said specifically, and I've been in her office, it's kept in a locked file in her office that is only accessible to her and her administrative assistant. This is not part of the student's permanent file. So what's the difference between this and Levine? Well, Levine, it was part of the student's permanent file, one. Two, Levine was a free speech case, and the reason that the file was even being talked about in Levine is not because there's some sort of federal law that governs what sort of records a district keeps in general, but that the keeping of that record was viewed by the Levine court as being an instance of retaliation for the free speech that Levine had exercised. I don't know that I see the word retaliation here. Where do you see that, counsel? Well, at the tail end of the Levine opinion, they're talking about – I'm sorry? 992. At the tail end of the opinion, they're talking about – I believe the word retaliation might be mine, but – That is your word, because if retaliation was there, I would be asking you about that. Well, I think the concept is what they are talking about, because they are saying – Isn't what they're really talking about is that once the reason for the records ceasing to exist, the records should also cease to exist? I don't think so. I think what they are talking about is that the appropriate response to the speech that kept the school district on safe grounds was that all it did was remove the student until it determined whether there was a risk of harm, and that to rewrite a letter that left out the reinstatement of the student and only addressed his misconduct was an improper reaction to the speech of the student. And I believe that is the point. But it was inaccurate also. The record was inaccurate. It was inaccurate. One, it was written well after the fact and – All right. Well, why do you need the records here? All right. He's in high school now, apparently. And apparently the school did make a determination that it was okay for him to come back, that he wasn't a risk, right? So why do we need the records? One, we have a new superintendent now. Two, as with the superintendent, personnel changes. Three, these aren't empirical determinations. Well, does he have to say – if he's asked whether he was expelled, does he have to say he was expelled when it was emergency and then it was determined it wasn't necessary? I don't – well, I'm scratching my head about that for two reasons. One, whether the records were shredded in 2006 or 2008 or 2010, I don't know how that changes the answer to that question. What does the existence of the record have to do with a true answer? Well, counsel tells us what it is. If he's in high school, when they shred the record, he's applying for college. And so the record's there. If it's shredded in middle school, I don't know. But if they ask him the question, have you ever been expelled, does his answer change because the records have been shredded or not? Well, is there any procedure to – you know, what they want to expunge because you determined that it was something that happened off campus. You had a duty to make sure that he was safe to be around other students. You ascertained that he was, and so you let him back on. It's not the typical expulsion where something happens on campus and, you know, you're disciplined for something that you did at school. And that was the second part of my answer. I believe he can truthfully answer, no, I have never been expelled because the way the WAC is written and the way – and it's stated in our brief, it is rescinded. Rescinded is to have voided it. I won't say it didn't happen. But he can say that – I mean, technically that he was not because it was rescinded. And the nature of it was not a disciplinary suspension, which is what they're looking for. The nature of it was an evaluation of whether a risk was presented, and that has been rescinded. So I think he can truthfully say, no, I have not been expelled. Well, the expulsion then is because of the WAC. Because a danger was recognized, conditioned upon getting an evaluation, once evaluation happens, then it is your word rescinded? The WAC's word, rescinded. Well, yeah, rescinded. Now, so would this argument apply whether or not we hold that it was a proper emergency expulsion or whether it was improper to expel? Does it matter? Well, and this goes back to why the free speech distinction is important in Levine. I don't know what the source of a federal court's authority to micromanage the record-keeping at a high school is if it isn't the existence of a constitutional violation. Levine put us in the box, and it's the law, and we have to follow it. And that's why I was explaining the distinction in Levine. I think the only way that can be justified is if the Levine court is looking at the maintenance of those records as being an improper response to free speech that goes beyond what the school needed to deal with the free speech. And therefore, even though the court doesn't say it, it is retaliation for the free speech. They do refer in Levine to the First Amendment issue in talking about the expulsion of the records. So that is something they did address. I'm sorry, I lost. Levine does talk about the First Amendment issue as part of the reason for their stating that the records should be expunged, as I recall. They did not talk about retaliation. They did talk about the implication of the First Amendment rights in the case. It doesn't change, however, the fact that the reason for the records being created in the first place has ceased, why the records should not be expunged at some point in time, right? I agree completely, and the school district does not dispute that. And the only reason they would be kept is because we say that there's an evaluation that's been done, but we're talking about human behavior. And if something comes up, God forbid, in the future, the presence or absence of a record on this to go back to, and some of these expulsions are of juniors and seniors and events that happen, and they have to be judged in the context of what that student has gone through before. And it would be an important fact if, unfortunately, Student Doe was in this situation again. But it would be relevant. All right, Judge Bernetti has an additional question of you. I'm going to ask one more question because I want to make sure I understand what we're talking about here. Levine was very clear because it was talking about specific documents and the nature of those documents, including negative documents. You're telling me that the record would show the only thing in this file that we're talking about expungement are the two letters written by the superintendent. It's just a brief mention in one of the answers to her interrogatory questions, in her deposition questions, that it's the two letters. And I think one of the critical distinctions is the accuracy of those letters. That's fine. I just want to know that what we're talking about, those two letters and nothing else in the file. That is her testimony. Okay. All right. Thank you for your argument. All right. We've had additional questions. The time has actually expired, but, counsel, I'll give you two minutes for rebuttal. Thank you very much, Your Honor. I'd like to see if I can make two or three points. First of all, I want to draw your attention to this language in Goss. The student's interest, neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspension may be imposed by any procedure the school chooses, no matter how arbitrary. That's on page 576, and I stress the mention there of a reputation interest. And then on page 579, the student's interest is to avoid unfair or mistaken exclusion from the educational process with all of its unfortunate consequences. And I wanted to point you to unfair or mistaken because I gather from your questions that you're saying, well, he admitted, it's certainly the main thrust of the facts of what happened, but that is not the only issue which should be explored and would have been explored had there ever been a hearing. The other issue is, is exclusion fair? Is exclusion justified on the basis that he's a present and continuing danger to the school? And he never admitted that. His parents argued at the evening meeting that they shouldn't have to prove that, and Goss says the burden should be on the school district to prove that. So the interest in having a hearing come before the exclusion is not just so that the facts will be accurately determined, but also that the consequences will be fair. And that involves addressing the issue of danger, which he never admitted. The other point I wanted to make was just to, it seems to me that Levine could not possibly be more on point because counsel was saying something about the whack. In this case, our case, Doe, the whack in Levine is the same whack. It's the exact same whack. It happened in this state, Levine did also. So the court there at the end of it said, okay, the school officials made a determination because they had facts which might reasonably lead them to forecast a substantial disruption of the material interference with school activities. That's page 992. And later down on that page they say, despite the fact that they had a basis for the exclusion, they said, quote, the school need not permanently blemish James' record and harm his ability to secure future employment. We recognize that the school may have had justification to document contemporaneously the reasons for its emergency expulsion, but the revised October 5, 1998 letter was written and maintained in James' file after the perceived threat had subsided, the school had allowed James to return to classes and had satisfied itself that James was not a threat to himself or others. As such, it created a permanent indictment of James without reference to the later ameliorating events and went beyond the school's legitimate documentation needs. Now, I can't give you the exact number of sort of years that passed, but because they affirmed the district court on this point in Levine, I think the time between the incident and the time that there was an injunction saying you've got to get that stuff out of his file was pretty short. In this case it's already been two years. All right. Thank you for your argument. This matter will stand submitted.
judges: Brunetti, Callahan, Benitez